# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JERALD S. BATOFF, | : | |
|     Plaintiff/ Counterclaim Defendant, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| JULIE CHARBONNEAU, | : | NO. 12-cv-05397 |
| and | : | |
| DEAN TOPOLINKSKI, | : | |
|     Defendants/ Counterclaim Plaintiffs, | : | |

## MEMORANDUM

YOHN, J.                                                                 March 19, 2013

On August 15, 2012, Jerald S. Batoff, plaintiff and counterclaim defendant ("plaintiff"), brought this action against Julie Charbonneau and Dean Topolinkski, defendants and counterclaim plaintiffs ("defendants"), for declaratory judgement. Defendants removed the action to this court on September 21, 2012, and filed their amended counterclaims on October 22, 2012, against plaintiff. Presently before the court is plaintiff's partial motion to dismiss counts IV, V, VI, and VII of defendants' counterclaims pursuant to rule 12(b)(6). For the reasons that follow, I will deny plaintiff's motion to dismiss count IV for unjust enrichment, but grant plaintiff's motion to dismiss count V for conversion, count VI for breach of fiduciary duty, and count VII for tortious interference with contractual relations.

**I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Defendants assert the following factual allegations in support of their counterclaims,

which I must accept as true for the purposes of this motion to dismiss.[1] In November 2011, Batoff and Charbonneau entered into a lease agreement that included an option ("the Lease/Option Agreement") for Charbonneau to purchase Bloomfield, a historic mansion in Radnor Township ("the Property"). (Defs.' Am. Countercl. ¶ 51.) Additionally, the parties signed a written joinder in which Dean Topolinski joined as a party to the Lease/Option Agreement and agreed to be a guarantor of Charbonneau's obligations under the Lease/Option Agreement. (*Id.* at ¶ 52.) Topolinkski had already entered into two previous agreements of sale for the Property with the plaintiff, however; due to inadequate funds he had been unable to close on the Property. (*Id.* at ¶¶ 13, 18, 29-30.) Also, Topolinksi and Batoff had previously signed a residential lease agreement, and accordingly, at the time of the November 2011 Lease/Option Agreement, defendants were already living in the Property. (*Id.* at ¶ 34.)

The Lease/Option Agreement had a five-year term from November 1, 2011, through October 31, 2016, with the annual rent of $315,000 due in equal installments on November 1, March 1, and July 1 of each lease year. (*Id.* at ¶ 55.) As part of the Lease/Option Agreement, defendants had the option to purchase the Property for $3.9 million during the lease period. The Lease/Option Agreement also specified that defendants had to pay a $900,000 non-refundable payment for the option to purchase the Property at the execution of the Agreement. (*Id.* at ¶ 57.) Defendants paid the $900,000 required under the Lease/Option Agreement to plaintiff. On

---

[1] The following summary is based on the allegations in defendants' answer and counterclaim, which I assume to be true for purposes of the plaintiff's motion to dismiss, *see Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009), as well as allegations in plaintiff's complaint that were admitted as true in defendants' answer, *see Hospitality Assocs. of Lancaster, L.P. v. Lancaster Land Dev., L.P.*, No. 07-03955, 2008 U.S. Dist. LEXIS 76772, at *8-9 n.4 (E.D. Pa. Sept. 30, 2008).

October 31, 2011, DGI, a company owned by Topolinski, wired $300,0000 to Midlantic Real Estate, a company owned by plaintiff. (*Id.* at ¶ 61.) On November 1, 2011, and November 22, 2011, defendants caused $400,000 and $305,000, respectively, to be wired to plaintiff. (*Id.* at ¶ 65.) Charbonneau wired plaintiff $300,000 on December 12, 2011. (*Id.* at ¶ 68.) Plaintiff accepted the entire $1.305 million defendants paid him; however, plaintiff, acting through Midlantic returned $300,000 to DGI.[2] (*Id.* at ¶¶ 62, 66, 70.) Thus, defendants paid plaintiff a total of $1.05 million–$900,000 for the option to purchase and $105,000 for the first rent payment–and consequently they validly obtained the option to purchase the Property. (*Id.* at ¶¶ 71-72.)

Additionally, paragraph 9 of the Lease/Option Agreement provided that defendants were responsible for paying for "fire, casualty and liability and rent abatement insurance against the Property" which were to be maintained by the plaintiff. (*Id.* at ¶ 58.) Paragraph 17 of the Lease/Option Agreement provided that if there was a casualty to the Property with a cost to repair the damages of more than $1 million, defendants would be allowed to exercise their option to purchase. (*Id.* at ¶ 60.) Additionally, according to paragraph 17 of the Lease/Option Agreement, if defendants exercised their option to purchase, they would be entitled to receive at the closing any insurance proceeds paid to plaintiff, and plaintiff would assign his rights to any unpaid insurance proceeds to the defendants. (*Id.*)

On April 4, 2012, a fire destroyed the house on the Property. (*Id.* at ¶ 73.) Defendants were forced to move out of the house because the damage the house sustained caused safety

---

[2] Batoff returned the $300,000 to DGI because both parties were concerned about the payment now that DGI was in bankruptcy proceedings. (Defs.' Answer ¶¶ 15-18.)

3

concerns. (*Id.* at ¶ 74.) However, defendants always had the intention to move back to the house once there were no more safety issues. (*Id.* at ¶ 75.) Immediately after the fire, plaintiff continued to treat defendants as if they still held a valid option to purchase the Property. (*Id.* at ¶ 76.) For example, plaintiff provided defendants with information about progress of the repairs to the house and about the insurance claim. (*Id.* at ¶¶ 78, 80.) The insurance policy provided that Chartis, the insurance company, would pay for the rebuilding of the house regardless of cost, or, if the house was not rebuilt, would pay out a maximum of approximately $22.4 million to the insured. (*Id.* at ¶ 81.)

On July 25, 2012, plaintiff hand delivered a letter to Charbonneau that stated no option to purchase the Property was ever validly obtained, and also set forth alleged defaults of the Lease/Option Agreement. (*Id.* at ¶ 95.) Prior to this letter plaintiff had not expressed to defendants that he believed Charbonneau had failed to obtain an option to purchase or that she had breached the Lease/Option Agreement in anyway. (*Id.* at ¶¶ 96-97.) Charbonneau cured all defaults that were possible to cure (some defaults were impossible to cure because they involved the destroyed house). On August 7, 2012, counsel for the defendants delivered to plaintiff a letter that exercised Charbonneau's option to purchase the Property and requested a closing date of September 7, 2012. (*Id.* at ¶¶ 99-101.) In response to defendants' August 7, 2012, letter, on August 15, 2012, plaintiff's counsel delivered a letter to defendants' counsel claiming that the contractual breaches had not been cured and also reiterating that the option to purchase the Property was null and void. (*Id.* at ¶ 102.)

On August 15, 2012, plaintiff filed this current lawsuit in the Delaware County Court of Common Pleas, claiming a breach of contract and seeking a declaratory judgement that: (1)

4

Charbonneau has no exercisable purchase option; (2) the agreement is null and void; (3) Charbonneau has no claim against the proceeds of any insurance claim under Batoff's insurance policy regarding the Property; and (4) Charbonneau has no right to participate in any settling of the insurance claim under Batoff's policy. (Compl. 16.) On August 21, 2012, defendants removed the action to this court.

Additionally, throughout August and September, counsel for defendants requested assurances from plaintiff that he would not sell the Property, modify the house, or settle the insurance claim. (Defs.' Am. Countercl. ¶ 106.) Plaintiff refused to make these assurances. (*Id.* at ¶¶ 109-10.) Consequently, on October 12, 2012, defendants' counsel notified plaintiff's counsel that they would file a motion requesting a temporary restraining order and preliminary injunction if plaintiff could not promise to refrain from selling the Property, modifying the house, or settling the insurance claim. (*Id.* at ¶ 116.) Plaintiff's and defendants' counsel had a telephone conversion on October 16, 2012, to discuss defendants' potential motion. (*Id.* at ¶ 118.) During this conversation plaintiff's counsel notified defendants' counsel for the first time that plaintiff had settled the insurance claim for approximately $21 million a week earlier. (*Id.*) Plaintiffs counsel also disclosed that plaintiff had spent $4 million of the insurance proceeds on his personal mortgage on the Property and to pay for the insurance adjuster, who handled the insurance claim resulting from the fire. (*Id.* at ¶ 119.)

On October 22, 2012, defendants filed their amended counterclaims (they had previously filed their counterclaims on October 1, 2012, requesting declaratory judgment and specific performance), and a Motion for a Temporary Restraining Order, Preliminary Injunction, and

Expedited Discovery regarding the insurance proceeds plaintiff received.[3] In defendants' amended counterclaims they request: declaratory judgment that they validly obtained and exercised the option to purchase and consequently have a right to the insurance proceeds (count I); specific performance (count II); breach of contract (count III); unjust enrichment (count IV); conversion (count V); breach of fiduciary duty (count VI); and tortious interference with contractual relations (count VII). On November 5, 2012, plaintiff timely filed this partial motion to dismiss counts IV, V, VI, and VII pursuant to rule 12(b)(6).[4]

## II. STANDARD OF REVIEW

"Courts use the same standard in ruling on a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) as they do for a complaint." *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 524 (W.D. Pa. 2011) (citing *United States v. Union Gas Co.*, 743 F. Supp. 1144, 1150 (E.D. Pa. 1990)). "To survive a motion to dismiss [under Rule 12(b)(6)], a [counterclaim] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [counterclaim] plaintiff pleads factual content that allows the court to draw the reasonable inference that the [counterclaim] defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (2009).

---

[3] I issued a temporary restraining order and ordered that the remaining insurance assets plaintiff received be put into escrow.

[4] On November 29, 2012, plaintiff filed a related action in this court alleging civil RICO violations, fraud, and common law conspiracy against defendants. Those claims was consolidated with this action on January 3, 2013.

In evaluating a motion to dismiss, a court should separate the "the factual and legal elements of a claim." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court "must accept all of the [counterclaim's] well-pleaded facts as true, but may disregard any legal conclusions." *Id*. at 210-11. The assumption of truth does not apply to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949. Rather, the counterclaim must contain "'enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

## III. DISCUSSION[5]

### A. Gist of the Action and Economic Loss Doctrines

Plaintiff seeks dismissal of all defendants' tort actions against plaintiff under the gist of the action and economic loss doctrines. Pennsylvania courts apply the gist of the action and economic loss doctrines "to determine whether tort claims that accompany contract claims should be allowed as freestanding causes of action or rejected as illegitimate attempts to procure additional damages for a breach of contract." *Bohler-Uddeholm Am., Inc. v. Ellwood Group,*

---

[5] In their briefs the parties exclusively rely on Pennsylvania law. Additionally, the Lease/Option agreement at issue in this case states that "this Lease shall be governed, construed and interpreted by, through and under the Laws of the Commonwealth of Pennsylvania." (Compl. Ex. 1.) Thus, because the parties implicitly agree that Pennsylvania law applies and because the Lease/Option agreement dictates that Pennsylvania law governs, I will apply Pennsylvania law in this case.

7

*Inc.*, 247 F.3d 79, 103 (3d Cir. 2001). The gist of the action doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims." *Etoll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002) (citing *Bash v. Bell Tel. Co.*, 601 A.2d 825, 829 (Pa. Super. Ct. 1992)).[6] The "critical conceptual distinction between a breach of contract claim and a tort claim is that the former arises out of 'breaches of duties imposed by mutual consensus agreements between particular individuals,' while the latter arises out of 'breaches of duties imposed by law as a matter of social policy.'" *Reardon v. Allegheny Coll.*, 926 A.2d 477, 486-87 (Pa. Super. Ct. 2007) (quoting *Hart v. Arnold*, 884 A.2d 316, 339 (Pa. Super. Ct. 2005)). To retain this conceptual distinction, the gist of the action doctrine prevents tort claims from "1) arising between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; and 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim." *Id.* at 486. Importantly, the gist of the action doctrine will not bar tort claims that are collateral to the performance of the contract. *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 719 (Pa. Super. Ct. 2005); *see also Etoll*, 811 A.2d at 17-20 (analyzing state and federal cases, and finding support for applying gist of the action doctrine to claims for fraud in the performance, but not fraud in the

---

[6] The Pennsylvania Supreme Court has never adopted the gist of action doctrine. *See Air Prods. & Chems. v. Eaton Metal Prods.Co.*, 256 F. Supp. 2d 329, 340 (E.D. Pa. 2003). However, the Pennsylvania Superior Court has consistently applied the doctrine and many district courts have done the same. *See id.* at 340 (citing *Etoll*, 811 A.2d at 14, and *Bash*, 601 A.2d at 829). I agree with and join these courts in predicting that if presented with the opportunity to adopt the gist of the action doctrine, the Pennsylvania Supreme Court would adopt it. Defendants apparently concede this point, as they challenge only the application of the gist of the action doctrine to this case, and not its availability as a defense in general.

inducement).

Similar to the gist of the action doctrine, the economic loss doctrine assists in maintaining the distinction between tort and contract actions. *See Air Prods. & Chems. v. Eaton Metal Prods.*, 256 F. Supp. 2d 329, 335 (E.D. Pa. 2003) (citing *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 925 (Pa. Super. Ct. 1989)). Under the economic loss doctrine, plaintiffs cannot recover economic losses in tort, when such losses flow from the breach of a contract. *See Werwinski v. Ford Motor Co.*, 286 F.3d 661, 671 (3d Cir. 2002) (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995)). Specifically, "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Adams v. Copper Beach Townhome Cmtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. Ct. 2003).

Plaintiff argues that pursuant to the gist of the action and economic loss doctrines, defendants' breach of contract action subsumes defendants' tort actions for conversion (count V), breach of fiduciary duty (count VI), and tortious interference with contractual relations (count VII). As detailed below, I agree with plaintiff that defendants' tort claims are barred by the gist of the action doctrine and accordingly, I decline to determine whether the economic loss doctrine applies, and if applicable whether it bars defendants' tort claims.

   1.   **Conversion**

"Conversion is the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Shonberger v. Oswell*, 530 A.2d 112, 114 ( Pa. Super. Ct. 1987) (citing *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964)). Although "[t]he mere existence of a contract between the parties does not

automatically foreclose the parties from raising a tort action, ... a party cannot prevail on its action of conversion when the pleadings reveal merely a damage claim for breach of contract." *Neyer, Tiseo & Hindo, Ltd. v. Russell*, No. Civ. 92-2983, 1993 WL 53579, at *4 (E.D. Pa. Mar. 2, 1993) (applying Pennsylvania state law). "Courts have dismissed conversion claims under the gist of the action doctrine where the alleged entitlement to the chattel arises solely from the contract between the parties." *Brown & Brown Inc. v. Cola*, 745 F. Supp. 2d. 588, 622 (E.D. Pa. 2010) (citing *Rahemtulla v. Hassam*, 539 F. Supp. 2d 755, 777 (M.D. Pa. 2008)). Thus, where the conversion and breach of contract claims are "inextricably intertwined, the success of the conversion claim depending entirely on the obligations as defined by the contract," the gist of the action doctrine bars the conversion claim. *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. Ct. 2003).

In their amended complaint, defendants allege that plaintiff has "converted at least $35 million worth of insurance proceeds that rightfully belonged to Defendants." (Defs.' Am. Countercl. ¶ 148.) Specifically, defendants claim that plaintiff is in actual possession of $21 million in insurance proceeds belonging to defendants, and that plaintiff is in constructive possession of $35 million of insurance assets that defendants could have received under the policy. (*Id.* at ¶¶ 149-52.) Defendants argue that the gist of the action doctrine does do not apply to their conversion claim for the insurance proceeds from the Property because they "allege independent torts arising from Plaintiff's breaches of duties imposed under Pennsylvania law." (Defs.' Br. Opp'n Pl.'s Partial Mot. to Dismiss ("Defs.' Opp'n Br.") at 12.) Instead of simply alleging that plaintiff converted the insurance proceeds owed to defendants under the Lease/Option Agreement, defendants argue in their brief, although not in their amended

counterclaims, that the gist of their tort claims focus on plaintiff "(1) developing and implementing his secret scheme to settle insurance claim; (2) wasting Defendants' right to have the insurance policy cover the rebuilding of the house[;] (3) wasting a portion of the insurance proceeds that he received; and (4) keeping insurance proceeds that properly belong to defendants." (*Id.*) However, while defendants artfully argue their conversion claim by focusing on plaintiff's "wrongful" acceptance and use of the insurance proceeds, defendants also note throughout their amended counterclaims they are only entitled to the insurance proceeds–the subject of this conversion claim–because of the Lease/Option Agreement, and their valid exercise of the option. (Defs.' Am. Countercl. ¶¶ 113-14, 121.) Thus, because defendants' "alleged entitlement to the [insurance proceeds] arises solely from the contract between the parties," *Cola*, 745 F. Supp. at 622, their conversion claim is subject to dismissal under the gist of the action doctrine.[7]

Defendants also argue that their conversion claim is independent of their breach of contract claim because it is based on duties owed between optionor and optionee under Pennsylvania common law, and consequently is not barred by gist of the action doctrine. (Defs.' Opp'n Br. 10, 12.) Defendants assert that they are not relying on plaintiff's breach of duties under

---

[7] Even if the Lease/Option Agreement did not include paragraph 17, which defendants allege explicitly grants them the insurance proceeds upon closing in the event of a casualty, if successful in this litigation defendants would still be entitled to the proceeds under the contract. *See Shaffer v. Flick*, 520 A.2d 50, 52 (Pa. Super. Ct. 1987) (concluding that optionee was entitled to insurance proceeds even though the proceeds were not expressly discussed in the agreement.) However, the fact that courts will read into an option contract an optionee's right to insurance proceeds based on equitable principles does not change the fact that defendants' conversion claim is barred by the gist of the action doctrine. Defendants do not have a separate property interest in the insurance proceeds absent the Lease/Option Agreement, and consequently their conversion claim is barred.

the Lease/Option Agreement with regard to the insurance proceeds, instead they are relying on the duties between an optionor and optionee created by Pennsylvania common law. (*Id.*) In essence, they are arguing that independent of plaintiff's breach under the contract, plaintiff also breached his common law duties as optionor by settling the claim without defendants, and spending a portion of the insurance proceeds. (*Id.* at 12-13.)

Defendants are correct in that even if a contract discusses duties between two parties, if societal norms also impose such duties, the action is not barred by the gist of the action doctrine. *See Cola*, 745 F. Supp. 2d at 623. For example, in *Partners Coffee Co., LLC v. Oceana Servs. & Prods. Co.*, No. CIV.A. 09236, 2009 WL 4572911, at *6 (W.D. Pa. Dec. 4. 2009), the plaintiff company sued the defendant company for breach of contract and conversion because it had stolen confidential business information and trade secrets from the plaintiff company. The court allowed the conversion claim to survive because it declined to find the confidential business information "to be intertwined with any contract provision since it is understood in our society that businesses will not interfere with each other's confidential information whether bound to each other by contract or not." *Id.* at *7. While defendants cite various cases discussing the duties between optionor and optionee, the cases they cite establish that duties only arise between the parties because of the option contract.[8] Unlike in *Partners Coffee* where there was a societal duty

---

[8] For example, defendants cite *Villoresi v. Femminella*, 856 A.2d 78, 82-83 (Pa. Super. Ct. 2004) and *Walsh v. Powell*, 76 Pa. D & C. 108, 111-14 (Ct. Com. Pl. 1951) to show that optionors can be liable to optionees for waste. However, as *Villoresi* explains, the duties of an optionor only arise because of the contract, and a plaintiff only recovers for a breach of those duties to ensure that the optionee receives the benefit he contracted for. *See Villoresi*, 856 A.2d at 82-83. In *Villoresi*, the court cites *Walsh* to explain that an optionee only receives compensation or injunctive relief for waste "to preserve the status quo to assure the optionee of the benefit of his bargain...." *Id.* at 82. Additionally, the court in *Villoresi* detailed that if the option to purchase expires without the optionee exercising it, then the optionee no longer has a cause of

12

not to steal, none of the cases defendants cite states that optionors owe duties absent the contractual relationship. Thus, defendants' argument fails. Moreover, in this case there is a specific contractual provision, in addition to the optionor-optionee relationship, that applies; namely paragraph 17, which states "Landlord [Batoff] may make proof of loss; provided, however, that any adjustment of a proof of loss shall require the prior written consent of Tenant [Charbonneau]. . . ." (Defs.' Am. Countercl. Ex. 1.)

Finally, defendants cite *M.H. Rydek Elec., LLC v. Zober Indus., Inc.*, No. 07-3885, 2007 WL 3407130, at *2 (E.D. Pa. Nov. 15, 2007) to argue that because plaintiff contests the validity and enforceability of the contract it would be unjust to dismiss the conversion action at this stage of the proceedings. In *M.H. Rydek Elec.*, the court declined to dismiss plaintiff's fraud and misrepresentation claims because the defendant contested the existence of the contract. *See id.* Unlike defendants' conversion claim, however, the torts in *M.H. Rydek Elec.* could exist independent of the contract. As detailed previously, in this case the defendants are only entitled to the insurance proceeds under the Lease/Option Agreement, and the only duties breached by the plaintiff are created by the Lease/Option Agreement. Thus, without the contract, the defendants have no conversion claim, and consequently it is not inappropriate to dismiss defendants' conversion claim at this stage of the proceedings. *See Woods v. ERA Med. LLC*, No. 08-02495, 2009 WL 141854, at *7 (E.D. Pa. Jan 21, 2009) (dismissing plaintiff's negligence claim even though defendant contested the existence of a contract between the parties because any duty owed by the defendant was owed pursuant to the contract.) Accordingly, I will grant plaintiff's

---

action. *Id.* The other cases defendants cite similarly do not hold that optionors owe optionees duties indepdent of their contractual relationship.

motion with respect to count V.[9]

## 2. Breach of Fiduciary Duty

Plaintiff argues that defendants' breach of fiduciary duty claim is precluded by the gist of the action doctrine because the only duties plaintiff had to defendants arose from the contract between the parties. I agree.

"A breach of fiduciary duty claim is barred by the gist of the action doctrine if the fiduciary duty alleged is grounded in contractual obligations." *Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008) (citing *eToll,* 811 A.2d at 19). In *Bohler-Uddeholm*, the court explained that when "'the larger social policies embodied in the law of torts' rather than 'the terms of the contract' are what underlie [a party's] breach of fiduciary duty claim" then the claim is not barred by the gist of the action. *Bohler–Uddeholm*, 247 F.3d at 105. In *Bohler-Uddeholm*, the Third Circuit concluded that because plaintiff's breach of fiduciary duty claim rested on the fiduciary duty a majority shareholder owes a minority shareholder in a joint venture and not on the duties detailed in the contract between the two parties, the claim was not barred by the gist of the action. *Id.* at 105

In their amended counterclaims defendants allege that plaintiff owed them fiduciary duties "created by the express provisions of the Option Agreement," and that by settling the insurance claim in general, and further by "settling the insurance claim for less than it was potentially worth, Plaintiff intentionally failed to act in good faith for the benefit of Defendants." (Defs.' Am. Countercl. ¶ 158, 159-60.) Thus, unlike in *Bohler–Uddeholm*, in this case

---

[9] Because I have dismissed defendants' conversion claim in its entirety, I will not determine whether defendants' conversion claim would be limited to the $21 million plaintiff received from Chartis.

defendants' fiduciary duty claim rests on the contracts between the parties and not on a fiduciary duty established as a matter or social policy. Consequently, defendants' fiduciary duty claim is "inextricably intertwined" with their breach of contract action, and is barred by the gist of the action doctrine.

Even though in their amended counterclaims defendants state that plaintiff's fiduciary duties were created by the Lease/Option Agreement, in their brief defendants revise their argument to state that their fiduciary duty claim does not rely on Lease/Option Agreement. (Defs.' Opp'n Br. 18.) Defendants now assert instead that their claim relies on the fiduciary duties optionors owe optionees under Pennsylvania common law. (*Id.*) Defendants cite various Pennsylvania cases that discuss the optionor-optionee relationship; however, none of the cases that defendants cite states that optionors owe fiduciary duties to optionees–instead the cases explain that the duties between optionor and optionee arise out of the contract. S*ee Villoresi*, 856 A.2d at 82 (holding that the optionor was not liable for waste of the relevant property because the option had expired and the optionee had failed to exercise it.)

Additionally, there is no reason to conclude that an optionor owes fiduciary duties to an optionee. "[A] fiduciary duty is the highest standard of any duty implied by law." *Ginley v. E.B. Mahoney Builders, Inc.*, No. Civ.A. 04-1986, 2005 WL 27534, at *2 (E.D. Pa. Jan. 5, 2005). A fiduciary relationship arises under Pennsylvania law where "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other." *Id.* at *1. (citing *Becker v. Chicago Title Ins. Co.*, No. 03-2292, 2004 WL 228672 at *8 (E.D. Pa. 2004). The relationship between that of an optionor and optionee is not

15

one of overpowering dominance or dependence; instead it normally arises from an arms length business contract. Consequently, because defendants have not alleged with facial plausibility that there is a fiduciary relationship between an optionor and optionee under Pennsylvania common law, if there is a fiduciary relationship between the parties, then it must be based on the terms of the contract. Therefore, defendants claim for breach of fiduciary duty is barred the gist of the action doctrine.

### 3. Tortious Interference with Contractual Relations

In count VII, defendants allege that by settling the insurance claim plaintiff tortiously interfered with defendants' actual or prospective contractual relation with Chartis because "[u]nder the terms of the Option Agreement, upon closing, Defendants had the right to be assigned the contractual relation with Chartis that ha[d] been held by Plaintiff." (Defs.' Am. Countercl. ¶ 166-67.) Defendants allege that plaintiff's tortious interference deprived them of at least $35 million that the policy was worth prior to plaintiff wrongfully settling the claim. (*Id.* at ¶ 170.) To establish tortious interference with actual or prospective contractual relations a party must prove: "(1) the existence of a contractual, or prospective contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring; (3) [t]he absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the defendants' conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant." *Brokerage Concepts v. United States Healthcare*, 140 F.3d 494, 530 (3d Cir. 1998) (citing *Pelagatti v. Cohen,* 536 A.2d 1337, 1343 (Pa. Super. Ct. 1988)).

Plaintiff argues that defendants' claim for tortious interference with contractual relations sounds in contract and not in tort and thus is barred by gist of the action doctrine. As explained above, the "critical conceptual distinction between a breach of contract claim and a tort claim is that the former arises out of 'breaches of duties imposed by mutual consensus'... while the latter arises out of 'breaches of duties imposed by law as a matter of social policy.'" *Reardon*, 926 A.2d at 486-87 (quoting *Hart*, 884 A.2d at 339). Upon examining defendants' claim for tortious interference with contractual relations, it is clear that defendants' claim arises from plaintiff's alleged breach of the Lease/Option Agreement and not from a duty imposed by law or social policy. For example, in their amended counterclaims defendants allege that "[u]nder the terms of the Option Agreement, upon closing, Defendants had the right to be assigned the contractual relation with Chartis that had been held by Plaintiff" and that by refusing to close and instead settling the insurance claim, plaintiff interfered with defendants' prospective contractual relations with Chartis. (Defs.' Am. Countercl. ¶¶ 166-67.) Defendants are essentially claiming that the action preventing them from contractual relations with Chartis was plaintiff's breach of the Lease/Option agreement when he settled the insurance claim instead of assigning over his insurance rights to defendants. Defendants fail to cite a duty imposed by law or society to assign over contractual insurance rights, thus the only duty breached by plaintiff was based on contract. *See Chemtech Int'l, Inc. v. Chem. Injection Technologies, Inc.*, 170 F. App'x 805, 809 (3d Cir. 2006) (affirming district court's dismissal of tortious interference claim based on gist of the action doctrine because party's actions did not violate social policy and instead only breached the contract between the parties.) Consequently, defendants' claim for tortious interference with

17

contractual relations is barred by the gist of the action doctrine.[10]

B. **Unjust Enrichment**

Defendants' counterclaim for unjust enrichment asserts that by "settling the insurance claim that rightfully belonged to Defendant[s], Plaintiff received a benefit of at least $21 million," and that "it would be inequitable and unjust for Plaintiff to be permitted to retain this benefit, which rightfully belongs to Defendants." (Defs.' Am. Countercl. ¶¶ 142, 145.) Plaintiff contends that defendants' claim for unjust enrichment must be dismissed because the relationship between the parties is based on a written contract. (Pl.'s Br. 6.) "The quasi-contractual doctrine of unjust enrichment [is] inapplicable when the relationship between the parties is founded on a written agreement or express contract." *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448 (Pa. 1969).

Nevertheless, a party may plead alternative theories of breach of contract and unjust enrichment when there is a dispute about the existence or validity of the contract in question. *See Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 527-528 (E.D. Pa. 2012). Defendants argue that their unjust enrichment claim should survive because in plaintiff's complaint and partial motion to dismiss, plaintiff disputes the validity and

---

[10] In their brief, defendants argue generally that their tort claims should not be dismissed based on the gist of the action doctrine because plaintiff contests the validity of the Lease/Option Agreement. The same reason cited above for dismissing defendants' conversion claim based on the gist of the action doctrine applies to defendants' tortious interference claim. While plaintiff challenges the validity of the Lease/Option Agreement, this fact does not allow defendants' tortious interference claim to survive. Like defendants' conversion claim, their claim for tortious interference would fail without the contract because plaintiff only had the duty to assign over the insurance claim because of the contract. *See Woods*, 2009 WL 141854, at *7. Thus, defendants' claim for tortious interference with contractual relations is barred by the gist of the action doctrine and will be dismissed.

18

enforceability of the Lease/Option Agreement between plaintiff and defendants. (Defs.' Opp'n Br. 14-15.) Specifically, plaintiff disputes that an option to purchase ever existed and claims that the Lease Agreement is null and void. Plaintiff details that because "defendants vacated the property [] and all deposit money and fixed rent received by Plaintiff was returned, the lease agreement was rendered 'NULL' and 'VOID' and terminated any option, if one ever existed, to purchase the Property." (Pl.'s Br. 4.) From plaintiff's own statements it is evident that there is a dispute regarding the validity and enforceability of the contract.[11] Consequently, plaintiff's motion to dismiss defendants claim for unjust enrichment will be denied.[12]

## IV. CONCLUSION

---

[11] Plaintiff cites *Sheinman Provisions, Inc. v. National Deli LLC*, for the proposition that even when a party may fail on a breach of contract action, the existence of a contract precludes recovery for unjust enrichment. (Pl.'s Reply Br. in Supp. of Partial Mot. to Dismiss ("Pl.'s Reply Br.") at 4.) However, *Sheinman* is inapplicable because unlike the facts of *Sheinman*, in this case there is a dispute about the validity and enforceability of a contract. *See Sheinman Provisions, Inc. v. National Deli LLC*, No. 08-453, 2008 WL 2758029, at *4 (E.D. Pa. July 15, 2008).

[12] In a footnote in plaintiff's reply brief for his motion to dismiss, plaintiff makes an additional argument that defendants' unjust enrichment claim fails because they did not assert the elements of that claim. (Pl.'s Reply Br. 4. at n.6.) Plaintiff details that to establish an unjust enrichment claim a party must prove that he benefitted the opposing party in some way. (*Id.*) Plaintiff argues that defendants' unjust enrichment claim must fail because the only benefit defendants gave him were the rent payments, which he returned to the defendants. (*Id.*) Plaintiff did not make this argument until his reply brief, and consequently defendants have not responded to it. Because this case is at the motion to dismiss stage, I must accept as true all factual allegations contained in defendants' answer and counterclaims. *See Iqbal*, 129 S. Ct. at 1950. In their counterclaims defendants allege that they paid plaintiff $900,000 for the option to purchase along with additional money for fixed rent and other deposit payments. (Defs.' Am. Countercl. ¶ 71.) While defendants admit to receiving some refunded money from plaintiff, they have not alleged that plaintiff has refunded all of the money they paid him. (Answer ¶ 37-38.) Thus, defendants have successfully alleged that they have benefitted plaintiff and it would be inappropriate to dismiss defendants' unjust enrichment claim at this time.

Plaintiff correctly argues that defendants' tort claims are barred by the gist of the action doctrine and consequently I will dismiss counts V for conversion, count VI for breach of fiduciary duty, and count VII for tortious interference with contractual relations. For the above reasons I will deny plaintiff's motion to dismiss count IV for unjust enrichment. An appropriate order accompanies this memorandum.